## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIN ROBERTSON, individually and on behalf of a class of all persons and entities similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STOCKTON MORTGAGE CORPORATION d/b/a QUILLO,<br><br>Defendant. | Case No.: 1:26-cv-00658-JKM |

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANT'S MOTION TO DISMISS

Plaintiff, Erin Robertson ("Robertson"), filed the Amended Complaint (ECF No. 6) on behalf of herself and a putative class alleging that Defendant, Stockton Mortgage Corporation d/b/a Quillo ("Stockton"), violated the Telephone Consumer Protection Act, 42 U.S.C. § 227 ("TCPA"), by making telemarketing calls to telephone numbers listed on the National Do Not Call Registry, without prior express written consent.

Stockton now files this Motion to Dismiss. In her Amended Complaint, Robertson seeks injunctive relief prohibiting Stockton from making telemarketing calls in violation of the TCPA. But Robertson lacks standing to seek injunctive relief because she does not and cannot sufficiently allege that she faces future injury that

8603192v.1

is concrete, imminent, and likely to recur. To the contrary, Robertson's factual allegations demonstrate that Stockton has not made an alleged telemarketing call to her telephone number *for over two years*.

Robertson therefore lacks standing to seek injunctive relief and the Court should dismiss that part of her Amended Complaint with prejudice.

## I.       FACTS AND PROCEDURAL HISTORY

Robertson contends that her telephone number ending in 4337 is a non-commercial telephone number not associated with any business, is used for personal residential purposes only, and has been listed on the National Do Not Call Registry since 2023. (ECF No. 6 at ¶¶ 18-20.) Plaintiff claims that she has never been a Stockton customer and never consented to receive calls from Stockton. (*Id.* ¶ 21.) Plaintiff alleges that she received multiple telemarketing calls from Stockton between May 8, 2024 and May 16, 2024. (*Id.* ¶¶ 22-25.)

The Amended Complaint concedes that Stockton was looking for someone named "Igbinosa," and it includes a copy of the following message:

8603192v.1

Hi Igbinosa, my name is Kyle Lynch, and I am a Sr. Loan Advisor with Stockton Mortgage.
I received info that you were looking into a possible home loan 🏠. Look no further as this is my specialty.
I have been helping my clients for almost a decade and I have closed over 1000 home loans. I'm very good at what I do, and I don't say that to brag or boast, but a take a ton of pride when it comes to helping my clients 🤩.
What are you looking to accomplish and how can I help?

Here's a link to my online app if that's easier for you:
https://quick.quillo.com/dr/c/ar487

Reply STOP to stop receiving messages

(ECF No. 6 at ¶¶ 22-23.) The text message shows that Stockton had received information that Igbinosa was looking into a possible home loan – meaning, the message did not occur in a vacuum but rather was based on a contact provided by the person known as Igbinosa for potential mortgage assistance.

This is not the first TCPA case Robertson has filed across the country predicated on alleged calls looking for someone named Igbinosa. She has filed at least ten other such cases around the country.[1] *See Robertson v. Mortgage Research*

---

[1] The Court is permitted to consider the complaints and other documents filed in these actions in ruling on this motion to dismiss because they are matters of public record. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

8603192v.1

*Center, LLC*, No. 2:24-cv-4106 (W.D. Mo.); *Robertson v. CWPVA Inc.*, No. 8:24-cv-01722 (C.D. Cal.); *Robertson v. Coveragex, LLC*, No. 8:24-cv-01744 (C.D. Cal.); *Robertson v. Clearone Advantage, LLC*, No. 1:24-cv-02312 (D. Md.); *Robertson v. Freerateupdate.com Corp.*, No. 8:24-cv-01760 (C.D. Cal.); *Robertson v. Wintrust Fin. Corp.*, No. 3:24-cv-00366 (D. Nev.); *Robertson v. Offerpad Brokerage CA Inc.*, No. 5:24-cv-02138 (C.D. Cal.); *Robertson v. Generation.XYZ LLC*, No. 2:24-cv-09085 (C.D. Cal.); *Robertson v. Movoto, Inc.*, No. 3:25-cv-01478 (N.D. Cal.); *Robertson v. Insurance Pipeline, Inc.*, No. 3:25-cv-00294 (D. Nev.). In one of these cases, *Robertson v. Mortgage Research Center, LLC*, No. 2:24-cv-4106 (W.D. Mo.), the defendant asserted a counterclaim for fraud against Robertson, alleging that Robertson had "knowingly and intentionally made false representations by submitting lead information and consenting to communications while concealing the true intent to initiate litigation. These false representations included submitting personal information, creating accounts, and providing express consent to receive communications." (Doc. No. 55.) Upon the filing of the counterclaim, the case was dismissed.

Robertson filed the Complaint in this action on March 15, 2026 (ECF No. 1) and the Amended Complaint on May 1, 2026 (ECF No. 6.). Robertson filed a motion to dismiss on May 15, 2026 and now files this memorandum of law in support.

4

8603192v.1

## II.    STATEMENT OF QUESTIONS INVOLVED

1.    Does Plaintiff lack standing to seek injunctive relief because she does not sufficiently allege that she faces future injury that is concrete, imminent, and likely to recur?

Suggested Answer: Yes.

## III.    LAW AND ARGUMENT

### A.    Standard of Review.

"A plaintiff bears the burden of establishing that [s]he has Article III standing for each type of relief sought." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012). "In order to have standing to seek injunctive relief, a plaintiff must show: (1) that [s]he is under a threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will prevent or redress the injury." *Id.* "Even if the plaintiff has suffered a previous injury due to the defendant's conduct, the equitable remedy of an injunction is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." *Id.* "Past exposure to illegal conduct does not in itself show a present case or controversy

5

regarding injunctive relief." *Id.* "Accordingly, a plaintiff may have standing to pursue damages, but lack standing to seek injunctive relief." *Id.*

### B.      Plaintiff Lacks Standing to Seek Injunctive Relief.

Robertson lacks standing to seek injunctive relief because she does not sufficiently allege that she faces future injury that is concrete, imminent, and likely to recur. Indeed, Robertson's factual allegations demonstrate the exact opposite – that Stockton has not made an alleged telemarketing call to her telephone number for over two years. And there are no factual allegations in the Amended Complaint to support a claim that there is a real or immediate threat that Stockton will do so in the future.

Robertson attempts to avoid this result by alleging that the "recurrent and relatively recent nature of the alleged calls establish a sufficient likelihood that [Stockton] will call [Robertson] in the future." (ECF No. 6 at ¶ 30.) This conclusory allegation is wholly belied by Robertson's specific factual allegation that the telemarketing calls at issue occurred over a nine-day period more than two years ago. (*Id.* ¶ 25.) In addition, the fact that Robertson continues to subscribe to and use the same telephone number, that the telephone number remains on the Do Not Call Registry, and that Stockton continues to use telemarketing to generate mortgage leads change nothing. The fact is that Stockton has not called Robertson in more than two years, and there is no reasonable basis to believe that it will do so in the future.

6

In a factually similar case alleging TCPA violations, Judge Murphy of the Eastern District of Pennsylvania recently granted a motion to dismiss a claim for injunctive relief for lack of standing. *See Children's Dental Health Associates, LLC*, No. 25-5238, 2026 WL 927378 (E.D. Pa. Apr. 6, 2026). There, the plaintiff alleged that he had received two telemarketing text messages from the defendant even though the number at issue was listed on the National Do Not Call Registry a few months before he filed the complaint. *Id.* at *1. Judge Murphy granted a motion to dismiss the claim for injunctive relief for lack of standing, finding that the plaintiff "did not plead any factual basis to conclude that he is at risk of any real or immediate threat that he will be wronged again by another text message." *Id.* at *3.

The Court should reach the same result here, especially because Robertson does not allege that she has received a telemarketing call from Stockton in over two years. Other courts have rejected injunctive relief claims under the TCPA based on similar circumstances as here and in *Children's Dental Health Associates. See, e.g., Blair v. Assurance IQ LLC*, No. 23-0016, 2023 WL 6622415, at *5 (W.D. Wash. Oct. 11, 2023) (dismissing claim for injunctive relief under TCPA for lack of standing where complaint alleged calls over a seven-day period three months before complaint was filed); *Miller v. Time Warner Cable Inc.*, No. 16-00329, 2016 WL 7471302, at *4 (C.D. Cal. Dec. 27, 2016) (dismissing claim for injunctive relief

8603192v.1

under the TCPA for lack of standing where complaint alleged calls had not been received by plaintiff for eight months when complaint was filed).

Nevertheless, in support of her request for injunctive relief, Robertson claims that Stockton's "policies and procedures for avoiding sending illegal telephone calls are either non-existent or inadequate," suggesting this means Stockton might end up calling her again. She relies on the fact that Stockton was trying to reach someone named "Igbinosa" when it contacted Robertson. (ECF No. 6 at ¶ 33.) But this fact only undercuts, rather than supports, any contention that Robertson is exposed to future telephone solicitation calls because Stockton was not even attempting to reach her – and has not called her in years at this point.[2]

For all these reasons, Robertson has not and cannot allege that she is under a threat of suffering injury in fact that is concrete, particularized, actual, and imminent. She therefore fails to state a claim for injunctive relief, and the Court should dismiss it for lack of standing.

---

[2] Although beyond the scope of this motion, Stockton has reason to believe – as alleged in *Robertson v. Mortgage Research Center, LLC* – that Robertson is participating in a scheme designed to trick companies like Stockton into making telemarketing calls to Robertson's telephone in an honest attempt to reach Igbinosa, who they believed had provided consent for these calls. For this reason, Stockton believes that it is likely the victim of a fraudulent scheme, which undercuts any argument that Stockton's policies and procedures for TCPA compliance were inadequate.

8603192v.1

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, Stockton respectfully requests that the request for injunctive relief in the Amended Complaint be dismissed for lack of standing.

Respectfully submitted:

/s/ Christopher A. Reese
Andrew K. Stutzman
Eric M. Hurwitz
Christopher A. Reese
STRADLEY RONON STEVENS &
YOUNG, LLP
2005 Market Street
Suite 2600
Philadelphia, PA  19103
(215) 564-8000 (telephone)
(215) 564-8120 (facsimile)
creese@stradley.com

*Attorneys for Defendant*
*Stockton Mortgage Corporation*

Dated: May 29, 2026

8603192v.1

2026 WL 927378
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Jourey NEWELL, individually and on behalf of a
class of all persons and entities similarly situated
v.
CHILDREN'S DENTAL HEALTH ASSOCIATES, LLC

CIVIL ACTION NO. 25-5238
|
Filed 04/06/2026

**Attorneys and Law Firms**

Anthony Paronich, Pro Hac Vice, Paronich Law, P.C., Hingham, MA, Jeremy C. Jackson, Bower Law Associates, PLLC, State College, PA, for Jourey Newell.

Benjamin Richard Wilson, Holland & Knight LLP, Philadelphia, PA, Lindsey Cook, Fox Rothschild LLP, Blue Bell, PA, Jill Heather Fertel, Cipriani & Werner, P.C., Blue Bell, PA, Sarah Adams, Blue Bell, PA, for Children's Dental Health Associates, LLC.

**MEMORANDUM**

MURPHY, J.

**\*1** This is one of Jourey Newell's many federal cases brought under the Telephone Consumer Protection Act. Mr. Newell received two text messages from Children's Dental Health Associates asking if he wished to book an appointment for a named individual. According to Mr. Newell, he had never done business with the dental office nor contacted them for any purpose. And he had placed his phone number on the national Do Not Call registry. If a person elects to place their residential phone number on the national Do Not Call registry, that preference must be honored. Under the TCPA, violations can amount to $500 per mode of contact or triple that if the violation was willful. Mr. Newell brings this class action claim under the TCPA and requests injunctive relief. And things begin with Children's Dental's motion to dismiss, which challenges Mr. Newell's standing to seek injunctive relief, and whether he can state a claim about text messages when the statute says "calls." These are familiar issues to courts. Because we find that unsolicited texts are governed by the TCPA, Mr. Newell's claim survives for now. But

Mr. Newell's two isolated text messages are insufficient to state a claim for injunctive relief. For the following reasons, defendant's motion to dismiss is denied in part and granted in part.

**I. BACKGROUND**

Plaintiff Jourey Newell received two unsolicited text messages from defendant Children's Dental Health Associates, LLC: one on May 6, 2025, and one on June 25, 2025. DI 1 at ¶ 21. Mr. Newell received these messages despite never being a customer, never inquiring about their services, and never providing consent to be contacted. *Id.* at ¶¶ 20, 23, 25. Mr. Newell had placed his residential telephone number on the national Do Not Call (DNC) registry on March 19, 2025, to avoid being contacted by businesses without his consent. *Id.* at ¶ 19. The complaint includes both messages as screenshots. *Id.* at ¶ 22. The first message from Children's Dental offered to "[b]ook an appt [sic] that fits your family's availability" with a link and signature identifying the sender as "Children's Dental Health – Downington" and continued, "[t]o unsubscribe, reply STOP." *Id.* Mr. Newell did not respond. The next message, sent seven weeks later from the same sender, identified a particular patient, stating "[m]ake Lailynn's smile shine bright this summer! Let's get your kiddo scheduled for a check-up ..." and again included a link to book an appointment, identified themselves as Children's Dental, and instructed how to unsubscribe from further communications. *Id.* The complaint does not say whether Mr. Newell is related to anyone named Lailynn. Mr. Newell responded to the second message by asking the sender to "[c]ease and desist all communications." *Id.* As pleaded, Mr. Newell did not receive any additional text messages from Children's Dental.

On September 11, 2025, Mr. Newell sued, seeking "injunctive relief and money damages." *Id.* at ¶ 38. Mr. Newell found the two messages to be "frustrating, obnoxious, annoying, were a nuisance and disturbed [his] solitude." *Id.* at ¶ 31. Mr. Newell believes that the same dental office has contacted numerous others in the same manner and "reasonably believes Class members number, at minimum, in the hundreds." *Id.* at ¶ 40. [1] Mr. Newell alleges that he and other similarly situated plaintiffs "were temporarily deprived of legitimate use of their phones because the phone line was tied up, and their privacy was improperly invaded. Furthermore, the calls unnecessarily used battery life, storage space, bandwidth, and wear and tear." *Id.* at ¶ 30. Throughout his complaint, Mr. Newell refers to the texts as "calls." *Id.* at ¶¶ 3-4, 25, 28-31, 51, 53-54.

Because plaintiff has not submitted a motion for class certification pursuant to Rule 23, we do not address the issue here. *See* Fed. R. Civ. P. 23.

## II. MOTION AT ISSUE

**\*2** Children's Dental filed a motion to dismiss plaintiff's class action complaint, citing lack of standing for injunctive relief under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6). DI 18. Children's Dental argues that Mr. Newell lacks standing for injunctive relief because he does not sufficiently plead that a future call or text message from Children's Dental is imminent or likely. DI 18-1 at 11-13. Children's Dental argues that the class action complaint should be dismissed because the alleged text messages are not "calls" for the purposes of the TCPA. *Id.* at 2, 4-7. In the alternative, Children's Dental argues that even if texts were considered calls, the text messages are exempt from the TCPA because they are not advertisements or solicitations, but rather informative messages that fall under a healthcare exemption. *Id.* at 7-11. Additionally, defendant asks us to apply a narrow interpretation of "telephone solicitation" based on the content of the text messages, pursuant to the national DNC registry which is governed by 47 C.F.R. § 64.1200(c)(2). DI 18-1 at 10-11. Specifically, Children's Dental argues that the texts received by plaintiff were not for "the purpose of persuading [him] to pay for certain services," nor for "encourag[ing] a 'purchase.' " *Id.*

Mr. Newell filed a memorandum in opposition to Children's Dental's motion to dismiss. DI 21. In his opposition memo, Mr. Newell alleges that the text messages he received were "unsolicited marketing text messages" and "promotional advertisement[s]" to use Children's Dental's services. *Id.* at 7-8, 20-25. As pleaded, Mr. Newell was never a customer of and never inquired about the dental service, so the messages, he argues, were sent "to initiate a new commercial service relationship—not to confirm or remind him of any existing appointment." *Id.* at 25. Additionally, Mr. Newell added a new allegation that Children's Dental continued to send texts "after Plaintiff demanded that Defendant cease communications." *Id.* at 26. Children's Dental responded to Mr. Newell's opposition, reiterating its arguments that plaintiff failed to establish standing for injunctive relief; that texts are outside the scope of § 227(c); and, even if texts could be regulated within the bounds of the statute, plaintiff's claim fails because the messages were not solicitations. DI 22 at 1-8.

## III. STANDARD OF REVIEW

### A. Rule 12(b)(1): standing for injunctive relief

"A plaintiff bears the burden of establishing that he has Article III standing for each type of relief sought." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). To establish standing for injunctive relief, "a plaintiff must show: (1) that he is under a threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will prevent or redress the injury." *Id.* (citation modified) (citation omitted). "Even if the plaintiff has suffered a previous injury due to the defendant's conduct, the equitable remedy of an injunction is 'unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]' " *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)) (other citation omitted). "Accordingly, a plaintiff may have standing to pursue damages, but lack standing to seek injunctive relief." *Id.* (citing *Lyons*, 461 U.S. at 105).

### B. Rule 12(b)(6): failure to state a claim

When considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. A court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [plaintiff]." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

### C. The Telephone Consumer Protection Act

**\*3** The TCPA is a consumer protection statute that seeks to protect consumers from invasions of privacy from debt collectors, telemarketers, and spammers alike. *See* 47 U.S.C. § 227. Subsections 227(b) and (c) provide private rights of action for violations of relevant federal regulations. *See* 47 U.S.C. §§ 227(b)(3) and (c)(5). Those regulations are

prescribed and updated by the Federal Communications Commission (FCC). *See* 47 C.F.R. § 64.1200. Congress likewise authorized the FCC to create and maintain a national database of consumers who elect to register their residential phone numbers on the national Do Not Call (DNC) registry. 47 U.S.C. § 227(c)(3).

## IV. DISCUSSION

### A. Plaintiff lacks standing to seek injunctive relief

Mr. Newell alleges that he received two text messages, each on a different date. DI 1 at ¶ 21. Mr. Newell does not allege that Children's Dental continued to contact him after he requested that they "cease and desist all communications." *Id.* at ¶ 22. Mr. Newell later claimed in his opposition to defendant's motion to dismiss that Children's Dental "sent at least two solicitation texts within a 12-month period, including after Plaintiff demanded that Defendant cease communications." DI 21 at 26. However, Mr. Newell failed to include in his complaint that he was contacted by Children's Dental after asking them to stop contacting him. "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citation omitted). Because Mr. Newell did not plead any factual basis to conclude that he is at risk of any "real or immediate threat that [he] will be wronged again" by another text message, his claim does not establish standing for injunctive relief. *Lyons*, 461 U.S. at 111. Accordingly, defendant's motion to dismiss the claim for injunctive relief is granted without prejudice.

### B. Plaintiff states a claim under 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)

The TCPA provides a private right of action for individuals who have "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). The relevant regulation, 47 C.F.R. § 64.1200(c)(2), bars "any telephone solicitation to [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry[.]" *Id.* An individual is entitled to "receive up to $500 in damages for each such violation" or treble damages if the violation was willful. 47 U.S.C. § 227(c)(5)(B)-(C). The TCPA defines a "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person[.]" 47 U.S.C. § 227(a)(4).

For a claim to survive under this section, a plaintiff "must plead that (1) they receive[d] multiple calls within twelve months, (2) by or on behalf of the same entity, (3) on a residential phone registered on the [Do Not Call] List." *Camunas v. Nat'l Republican Senatorial Comm.*, 541 F. Supp. 3d 595, 604 (E.D. Pa. 2021) (citation omitted).

Mr. Newell received two texts from defendants less than two months apart (on May 6, 2025, and June 25, 2025). DI 1 at ¶ 21. Both texts were from defendant ("Children's Dental Health – Downington"), who identified itself as such, and were sent from the same phone number. *Id.* at ¶ 22. Mr. Newell's phone that received the texts "is a residential telephone line ... for consumers and is not assigned to a telephone exchange service for business." *Id.* at ¶ 17. Mr. Newell had placed his residential number on the national Do Not Call (DNC) registry in March 2025. *Id.* at ¶ 19. That checks most of the relevant boxes to state a claim. The remaining pertinent questions are (1) whether texts may be considered "calls" for the purposes of the statute and (2) if so, might the texts possibly be solicitations?[2] We answer affirmatively as to both inquiries.

[2]    We do not rule on whether the text messages were solicitations at the motion to dismiss stage, where plaintiff need only plead factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### 1. A commonsense interpretation of the statutory text and purpose of the TCPA shows that texts should be considered calls

 **\*4**  In *McLaughlin Chiropractic Assoc., Inc. v. McKesson Corp.*, the Supreme Court held that district courts are not "absolutely bound by the FCC's interpretation of the TCPA." 606 U.S. 146, 152 (2025).[3] Instead, district courts "must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *Id.* at 155 (citation omitted); *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 402 (2024).

[3]    *McLaughlin* concerned whether courts are bound by the FCC's interpretation of the TCPA in the context of pre-enforcement proceedings under the Hobbs Act. 606 U.S. 146 (2025).

"As in all cases of statutory interpretation, our inquiry begins with the language of the statute[.]" *United States v. Abbott*, 574 F.3d 203, 206 (3d Cir. 2009) (citation omitted). The TCPA's stated intent is "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). It provides a private right of action for "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed[.]" *Id.* at § 227(c)(5). Congress authorized the FCC authority to "prescribe regulations to implement methods and procedures for protecting the privacy rights described[.]" *Id.* at § 227(c)(2). In doing so, Congress recognized that those regulations "may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase." *Id.* at § 227(c)(3). Those regulations also "prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database[.]" *Id.* at § 227(c)(3)(F). The FCC determined such a database was necessary and enacted the national DNC registry in 2003. [4] Both the TCPA and the Federal Regulations define a "telephone solicitation" as "a telephone call *or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services[.]" 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15) (emphasis added).

[4]    The 2003 order revised the TCPA and established the DNC registry with the Federal Trade Commission. *In Re Rules & Regulations Implementing the TCPA of 1991*, 18 F.C.C. Rcd. 14014, 14017 (2003). *See also* 47 C.F.R. § 64.1200(c)(2) ("No person or entity shall initiate any telephone solicitation to ... [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry[.]").

**a. The plain meaning of the statute suggests that "call[s]" include text messages**

Because the TCPA does not define a "call" anywhere in the statutory text, we first examine the plain meaning of the term as it was understood when the statute was enacted in 1991. [5] *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018) ("[I]t's a fundamental canon of statutory construction that words generally should be interpreted as

taking their ordinary, contemporary, common meaning ... at the time Congress enacted the statute." (citation modified) (citation omitted). The Ninth Circuit helpfully examined "the ordinary, contemporary, and common meaning of the verb 'to call,' " which has the same meaning today as it did in 1991: "to communicate with or try to get into communication with a person by a telephone." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953-54 (9th Cir. 2009) (citing Webster's Third New International Dictionary 318 (2002)); *see also Cole v. C/T Install America LLC*, 2026 LEXIS 63254, at *1 n.1 (E.D. Pa. March 23, 2026) (only available on Lexis) ("Based upon the definition of 'call' at the time of the TCPA's passage, there was no requirement that the communication via telephone be oral."); *Wilson v. Better Mortg. Corp.*, 811 F. Supp. 3d 631, 637 (S.D.N.Y. 2025) ("the ordinary public meaning of 'telephone call' when the TCPA was enacted in 1991 was a communication made by telephone.") (citation omitted). We agree with these courts. Today, there are numerous modes of communicating by telephone; texting is just one such way "to communicate with or try to get into communication with a person by a telephone." *Satterfield*, 569 F.3d at 953-54. Therefore, texting fits comfortably within the understood meaning of "call."

[5]    Children's Dental points out that text messages did not exist in 1991 (when the TCPA was enacted). True enough, but that is not dispositive. When the Act was signed into law, its drafters could not have imagined any number of today's technological advancements. But courts do not give up in that sort of situation; rather, they interpret the language as best they can using all available tools. *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016) ("[w]hen technological change has rendered literal terms ambiguous, [a law] must be construed in light of [its] basic purpose.") (citing *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)).

**b. The full picture of the statutory text also supports treating texts as a form of "call"**

 **\*5** The "interpretation of a phrase of uncertain reach is not confined to a single sentence when the text of the whole statute gives instruction as to its meaning." *Essintial Enter. Sols. LLC v. United States SBA*, 166 F.4th 380, 385 (3d Cir. 2026) (citing *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017)). In one of the TCPA's other subsections, § 227(b), Congress addressed the problem of robocalls by placing "[r]estrictions on use of automated telephone

2026 WL 927378

equipment." 47 U.S.C. § 227(b). Subsection (b) prohibits "any person" from "mak[ing] any call ... using any automatic telephone dialing system or an artificial or prerecorded voice" or "initiat[ing] any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party[.]" § 227(b)(1)(A), (B). Despite mentioning "calls" rather than "texts," courts have understood § 227(b) to apply to text messages. In *Campbell-Ewald Co. v. Gomez*, the Supreme Court remarked that "it is undisputed" that a text message "qualifies as a 'call' within the compass of § 227(b)(1)(A)(iii)." 577 U.S. 153, 156 (2016) (citation omitted). And the Third Circuit came to the same conclusion a few years before in *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 269 n.2 (3d Cir. 2013) ("The TCPA's prohibition on automated dialing applies to both voice calls and text messages."). [6]

[6] *Gager* cited to both *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, SoundBite Communications, Inc.*, 27 FCC Rcd. 15391 (2012) (*SoundBite*), and *Satterfield*, 569 F.3d at 952, in support of the notion that the TCPA's prohibition on autodialers applies to both voice calls and text messages. *Gager*, 727 F.3d at 269 n.2. *SoundBite* was a Declaratory Ruling in which the FCC held that under the TCPA a business is permitted to send one final text confirming that a consumer wishes to opt-out of receiving messages. 27 FCC Rcd. at 15394, ¶ 7. *See also Satterfield*, 569 F.3d at 952 ("[A] text message is a 'call' within the meaning of the TCPA.").

We agree with courts in this district that have held consistently with the Supreme Court's remark in *Campbell-Ewald* to conclude that the restrictions placed on "calls" also govern texts pursuant to both §§ 227(b) and (c). *See Cole*, 2026 LEXIS 63254, *1 n.1 (finding that "nothing in the text, structure or purpose of the TCPA suggests the barring of text messages under § 227(c)"); *Shelton v. Pro Source Lending Grp. LLC*, 2025 WL 817485, at *4 n.4 (E.D. Pa. Mar. 14, 2025) (concluding that "text messages are considered 'calls' " for the purposes of § 227(c) and its implementing regulations); [7] *Perrong v. Chase Data Corp.*, 2024 WL 329933, at *2 (E.D. Pa. Jan. 26, 2024) (holding that texts are calls for the purposes of §§ 227(b) and (c)); *King v. Bon Charge*, 2025 WL 3764039, at *11 (D. Del. Dec. 30, 2025) ("A text message counts as a 'call[ ]' " under § 227(c)); *see also Newell v. RxLink Inc.*, No. 2:25-cv-4270 (E.D. Pa.

Mar. 12, 2026) (*mem.*) (order denying defendant's motion to dismiss in another one of Mr. Newell's cases alleging he received unsolicited texts in violation of § 227(c)). Not every district court sees it the same way, but our conclusion finds ample support here and around the country. [8]

[7] For ease of reference, the *Shelton* Court chose to "address the 5 calls and 3 texts at issue as an aggregate of 8 calls." *Id.* So plaintiff is not alone referring to his two texts as "calls" throughout his complaint and response.

[8] *Alvarez v. Fiesta Nissan, Inc.*, 2026 WL 202930, at *5 (S.D. Tex. Jan. 26, 2026) ("A text message therefore falls reasonably within the literal language of [§ 227(c)(5)]."); *Wilson v. MEDVIDI Inc.*, 2025 WL 2856295, at *4 (N.D. Cal. Oct. 7, 2025) (same); *Mey v. Liberty Home Guard, LLC*, 2026 LEXIS 739, at *15-18 (N.D.W. Va. Jan. 5, 2026) (same) (collecting cases) (only available on Lexis); *Bosley v. A Bradley Hosp. LLC*, 2025 WL 2686984, at *5 (S.D. Fla. Sept. 19, 2025) ("a text message constitutes a 'call' under the TCPA"); *Hudson v. Palm Beach Tan, Inc.*, 2024 WL 4190513, at *7-8 (M.D.N.C. Aug. 12, 2024), *report and recommendation adopted*, 2024 WL 4188310 (M.D.N.C. Sept. 13, 2024) (same); *Williams v. Myler Disability LLC*, 2020 WL 6693134, at *5 (W.D.N.C. November 12, 2020) (same).

**\*6** Defendant urges us to rely on the thoughtful opinions in *Davis v. CVS Pharmacy*, Inc., 797 F. Supp. 3d 1270 (N.D. Fla. 2025), and *Jones v. Blackstone*, 792 F. Supp. 3d 894 (C.D. Ill. 2025). But we are not persuaded. *Davis* focused on modern parlance rather than considering the broader meaning of a "telephone call" at the time the statute was enacted in 1991, as we think is appropriate. 797 F. Supp. 3d at 1273 ("no ordinary person would think of a text message as a '*telephone* call.' ") (emphasis in original). Similarly, *Jones* acknowledged that "[t]ext messaging was not an available technology in 1991," but then focused the analysis on "today's American parlance," concluding that " 'telephone call' means something entirely different from 'text message.' " 792 F. Supp. 3d at 899. We disagree and think the more expansive view of "call" follows from correctly focusing on 1991. [9] As the Supreme Court has often held, we should "interpret[ ] a statute in accord with the ordinary public meaning of its terms *at the time of its enactment*." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644,

654 (2020) (emphasis added); *see also Wis. Cent.*, 585 U.S. at 284; *Perrin v. United States*, 444 U.S. 37, 42 (1979).

9    We likewise find unpersuasive the supplemental authority submitted by defendant, which consists of four additional district court decisions from other jurisdictions. DI 24 at 1-5 (discussing *Radvansky v. 1-800-Flowers.com, Inc.*, 2026 WL 456919 (N.D. Ga. Feb. 17, 2026), *Stockdale v. Skymount Property Group, LLC*, 2026 WL 591842 (N.D. Oh. Mar. 3, 2026), *Richards v. Fashion Nova, LLC*, 2026 WL 847568 (S.D. Ind. Mar. 26, 2026), and *Richards v. Shein Distribution Corporation*, 2026 WL 847584 (S.D. Ind. Mar. 26, 2026)). As explained in this memorandum, we find that the broader reading of "call" is the better view.

Children's Dental also points to a 2018 amendment to the TCPA, where Congress added specific "text message" language to § 227(e) but not to §§ 227(c) or (b). DI 22 at 3. According to Children's Dental, this confirms that Congress did not mean for §§ 227(c) or (b) to include texts. *Id.* We disagree, and it starts right in the language of the subsection. Section 227(e) is titled "Prohibition on provision of misleading or inaccurate caller identification information" and reads: "[i]t shall be unlawful for any person ... in connection with any voice service or text messaging service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information[.]" 47 U.S.C. § 227(e). Congress expressly addresses its concerns about "*caller* identification information" to both "voice" and "text" services. *Id.* (emphasis added). Thus, the face of § 227(e) further confirms our view that a "call" can implicate a voice conversation or a text conversation.

Holding, as Children's Dental urges, that "telephone calls" encompasses texts under some subsections, but not others, would yield potentially absurd inconsistencies. The statute nowhere appears to suggest that consumers should lack a private right of action to address unsolicited marketing text messages after registering for the DNC registry. And that result would cut directly against express guidance provided by the FCC. "Statutory interpretations 'which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.' " *First Merchants Acceptance Corp. v. J.C. Bradford & Co.*, 198 F.3d 394, 402 (3d Cir. 1999) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)). Accordingly, we agree with the district court in *Wilson*, that "[l]imiting § 227(c)'s reach to

telephone voice calls while § 227(b) [and § 227(e)] cover[ ] voice as well as text messages would create an irrational asymmetry at odds with the statute's text and structure." 811 F. Supp. 3d at 641.

**\*7** Contrary to Children's Dental's proposal, it is considerably more likely that the 2018 amendment reflects an understanding that the "telephone call" language in subsections (b) and (c) includes texts and remains inclusive of other ways that telephone users reach out and communicate with each other. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("As we have said before, the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (citation modified) (citation omitted). *See also In re Nickelodeon*, 827 F.3d at 287 (When Congress "empower[s] an administrative agency to augment the definition of [a term] in light of changing circumstances or new technologies[,]" it is a way of "buil[ding] flexibility into the statute to keep pace with evolving technology.").

### c. The TCPA's purpose as a consumer protection statute is consistent with treating texts as calls

Understanding calls to include texts under the TCPA is consistent with the statute's stated purpose: a consumer protection law designed to protect individuals' privacy. 47 U.S.C. § 227(c)(1). "Congress enacted the TCPA in an effort to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy and even a risk to public safety." 18 F.C.C. Rcd. at 14018, ¶ 4; [10] *see also Mims v. Arrow Financial Services, LLC*, 565 U.S. 368, 372 (2012) (describing the Act's purpose). Those unsolicited communications, whatever form they may take, "are not distinguishable in terms of being an invasion of privacy." *Satterfield*, 569 F.3d at 954; *see also Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 88 (2d Cir. 2019) ("the nuisance and privacy invasion attendant on spam texts are the very harms with which Congress was concerned when enacting the TCPA."); *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 390 (3d Cir. 2017) ("Turning to the TCPA's purpose we reiterate that the statute is remedial in nature and should be construed to benefit consumers.") (citation modified) (citation omitted). "[I]t strains belief to suggest that Congress silently determined that such oral messages were more invasive or objectionable than written ones." *Wilson*, 2025 WL 2856295, at \*3. Congress authorized the Federal Communications Commission (FCC) to prescribe regulations.

10      When the FCC seeks to amend a federal rule or explain a decision not to amend, its formal decision is written in a Report & Order (R&O). The FCC issues the R&O after providing opportunities for the public to ask questions and comment on the topic. The FCC Record (cited as Rcd.) is the commission's official publication of decisions like R&O's and accompanying documents. When a rule is finalized, that rule along with any explanations are then published in the Federal Register (FR). A deeper look into the FCC's process for drafting R&Os is available here: https://www.fcc.gov/general/understanding-fcc-processes (last accessed April 2, 2026).

Mr. Newell asks us to adopt the FCC's interpretation of the TCPA — that it applies broadly to texts. DI 21 at 18-20. Children's Dental argues that the FCC is incorrect, urging us to set aside its interpretations as we are authorized to do under *McLaughlin.* DI 18-1 at 5 (citing *McLaughlin*, 606 U.S. 146). We find no reason to disagree with the FCC's persuasive reading of the TCPA — a reading with which, as this memorandum highlights, several courts across the country also have agreed. Moreover, Congress entrusted the FCC with an active role in the TCPA's enforcement [11] and with the authority to prescribe regulations as codified in §§ 227(b)(2), (c)(2), (d)(2)-(3), and (e)(3). *Newell v. JR Capital, LLC*, 791 F. Supp. 3d 571, 576 (E.D. Pa. 2025). The FCC has broad discretion under the statute, including "ample flexibility to exclude robocalls from TCPA's scope through the administrative process." *Perrong v. Bradford*, 157 F.4th 251, 258 (3d Cir. 2025); 47 U.S.C. § 227(b)(2) (B)-(C). [12] This discretion appears entirely consistent with the need to address ever-changing technologies while also protecting legitimate business interests. [13]

11      Even in a non-private action, if "a legal officer of a State" or other authorized official brings an action on behalf of that State's residents, the FCC has the authority "to intervene in the action," "to be heard on all matters arising therein," and "to file petitions for appeal." 47 U.S.C. § 227(e)(6)(C).

12      "And this flexibility was central to the successful passage of the Act." *Perrong*, 157 F.4th at 258 (citing *Statement on Signing the Telephone Consumer Protection Act of 1991*, 27 Weekly Comp. Pres. Doc. 1877 (Dec. 20, 1991) ("I

have signed the bill because it gives the Federal Communications Commission ample authority[.]")).

13      "The Commission recognizes that telemarketing is a legitimate method of selling goods and services, and that many consumers value the savings and convenience it provides." *Implementing the TCPA of 1991*, 18 F.C.C. Rcd. at 14018, ¶ 3.

**\*8** The FCC has explicitly stated that "under the TCPA, it is unlawful to make any call" in violation of its subsections. 18 F.C.C. Rcd. at 14115. "This encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls[.]" *Id.* [14] More recently, the FCC reaffirmed that text messages should be regulated under the DNC registry just the same as telephone calls:

> The Commission adopts the proposal to codify the National DNC Registry's existing protections to text messages. Texters must have the consumer's prior express invitation or permission before sending a marketing text to a wireless number in the DNC Registry. The Commission previously concluded that the national database should allow for the registration of wireless telephone numbers and that such action will further the objectives of the TCPA and the Do-Not-Call Act. The Commission's action is consistent with Federal court opinions and will both deter illegal texts and make DNC enforcement easier.

*Targeting and Eliminating Unlawful Text Messages, Implementation of the TCPA of 1991, Advanced Methods to Target and Eliminate Unlawful Robocalls*, 89 FR 5098-1, 5099, ¶ 6 (2024). Thus, while we are not bound by nor deferential to the FCC's interpretation of the TCPA, [15] we find its interpretation amply supported by the statute's text and purpose, as well as by the reasoning of numerous courts that have tackled this interpretive question.

14      The FCC explained that SMS "provides the ability for users to send and receive text messages[.]" 18

2026 WL 927378

F.C.C. Rcd. at 14115, ¶ 165 n.606 (citing *Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993*, 17 F.C.C. Rcd 12985, 13051 (2002)).

*Loper Bright*, 603 U.S. at 392 (holding that "agency interpretations of statutes ... are not entitled to deference" and that courts must "decide whether the law means what the agency says.") (citation omitted); *McLaughlin*, 606 U.S. at 152 (explaining the district court is not "absolutely bound by the FCC's interpretation of the TCPA" and that it "should interpret the TCPA under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation").

## 2. The text messages are "solicitations" sufficient to survive dismissal

A telephone solicitation is "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services[.]" 47 U.S.C. § 227(a)(4). Excluded from that definition are "call[s] or message[s]" sent with the receiver's "prior express invitation or permission," sent "to any person with whom the caller has an established business relationship," or sent by "a tax exempt nonprofit organization." *Id.*

Children's Dental argues that the messages it allegedly sent to Mr. Newell were not solicitations because they were meant to persuade him to "use" its dental services rather than "pay" for those services. DI 22 at 5. Perhaps if Children's Dental offered free services, as was the case in *Hulce v. Zipongo Inc.*, then it would not be so clear that the text messages were solicitations encouraging the purchase of a service. 132 F.4th 493, 500-01 (7th Cir. 2025) (Affirming summary judgment for defendant who contacted plaintiff about "free services available through his state and Medicaid funded healthcare plan."). But nothing in the record (nor in the arguments by Children's Dental) indicates that the services promoted by Children's Dental in its texts to Mr. Newell would be free of charge. We thus find it plausible, at the pleading stage, that these texts were intended to persuade Mr. Newell to pay for defendant's services — not merely to use them.

**\*9** Children's Dental further argues that those messages were sent to inform a patient of an upcoming appointment and that "a prior relationship" is fairly evident from the texts themselves because the texts addressed a named individual. DI 22 at 6. But the mere provision of a name in a call or message does not end all inquiry into whether a prior relationship existed. *See Wilson v. Skopos Financial, LLC*, 2025 WL 2029274, at *3 (D. Or. July 21, 2025) (denying defendant's motion to dismiss and inferring that texts sent to the wrong name were "pretext" to form a commercial relationship).

From the facts alleged, which we must consider as true at this time, Mr. Newell stated he has no prior relationship with Children's Dental, has never been a patient, nor even inquired about Children's Dental's services. Determining whether a regulatory exception applies at this stage is therefore premature. "With some preliminary discovery, the true purpose and intended recipient of the text messages will be better evaluated." *Wilson*, 2025 WL 2029274, at *3.

## V. CONCLUSION

"Experience teaches that a statute's fixed meaning is not obvious in every instance. For example, questions can pop up about the meaning of statutory text when 'new *applications* ... arise in light of changes in the world.' " *Essintial*, 166 F.4th at 384 (citing *Wis. Cent.*, 585 U.S. at 284) (emphasis in original). This is certainly true in the field of telecommunications, where laws inevitably survive through generations of new technology. We agree with the FCC and many courts that have considered the question that the statutory language "calls" includes text messages. And having resolved the other sufficiency questions, we conclude that the plaintiff stated a claim, other than his request for injunctive relief. Defendant's motion to dismiss is granted in part and denied in part. An appropriate order accompanies this memorandum.

**All Citations**

Slip Copy, 2026 WL 927378

---

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:26-cv-00658-JKM    Document 8    Filed 05/29/26    Page 18 of 32

Blair v. Assurance IQ LLC, Not Reported in Fed. Supp. (2023)

2023 WL 6622415
Only the Westlaw citation is currently available.
United States District Court, W.D. Washington,
at Seattle.

Douglas Lee BLAIR, Plaintiff,
v.
ASSURANCE IQ LLC, Defendant.

CASE NO. C23-0016-KKE
|
Signed October 11, 2023

**Attorneys and Law Firms**

Avi R. Kaufman, Pro Hac Vice, Kaufman PA, Miami, FL, Eric R. Draluck, Eric R. Draluck Attorney, Bainbridge Island, WA, for Plaintiff.

Mark A. Silver, Pro Hac Vice, Nathan L. Garroway, Pro Hac Vice, Dentons U.S. LLP, Atlanta, GA, John David Du Wors, Du Wors Law Group, San Francisco, CA, Keith P. Scully, Nathaniel Eli Durrance, Newman Du Wors LLP, Seattle, WA, for Defendant.

ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION TO DISMISS
AND DENYING DEFENDANT'S MOTION
TO STAY OR BIFURCATE DISCOVERY

Kymberly K. Evanson, United States District Judge

**\*1** This matter comes before the Court on Defendant Assurance IQ, LLC's Motion to Stay Discovery or, in the Alternative, to Bifurcate Discovery, Dkt. No. 19, and Motion to Dismiss Amended Complaint, Dkt. No. 20. The Court GRANTS IN PART and DENIES IN PART the motion to dismiss with leave to amend. The Court DENIES Assurance IQ's motion to stay or bifurcate discovery.

### I. BACKGROUND

In January 2023, Plaintiff Douglas Blair filed this putative class action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, alleging that he received unlawful prerecorded telemarketing calls from CarInsurance.net—an entity owned and operated by Assurance IQ, LLC. *See generally* Dkt. No. 1. Blair filed an amended complaint (the operative complaint) in late March 2023. Dkt. No. 18. The relevant facts are as follows.

Blair registered his cell phone number on the National Do Not Call Registry (the "DNC List") on November 19, 2022. Dkt. No. 18 at 7. Over 31 days later, on December 23rd, he received six calls from CarInsurance.net. *Id.*; *see also id.* at 8 (image depicting call log). Blair did not answer these calls. *Id.* at 7. And he ignored two more calls from CarInsurance.net three days later. *Id.* at 8. On the evening of December 26th, however, Blair answered one of the calls. *Id.* He claims that a prerecorded voice message identified the caller as CarInsurance.net and solicited the sale of car insurance. *Id.* Blair believes the call was prerecorded "because of the tone, cadence, and timing of the speaker, which sounded unnaturally perfect." *Id.* at 9.

He received another call the following day. *Id.* Although Blair did not answer this call, "a pre-recorded voice message was left identifying the company name as CarInsurance.net [and] soliciting the sale of automotive insurance." *Id.* He thereafter continued to receive unsolicited calls from CarInsurance.net over the next few days—none of which he answered. *Id.* at 10–11. However, two more allegedly prerecorded voicemails were left on his phone on December 28th and 30th. *Id.* These messages again identified the caller as CarInsurance.net and solicited the sale of car insurance. *Id.* Blair asserts that the December 27th, 28th, and 30th voice messages are "identical," a fact he contends suggests that "all three were pre-recorded." *Id.* at 11.

Blair brings two TCPA claims against Assurance IQ. In Count 1, he alleges that it placed unsolicited prerecorded phone calls to his residential cell phone without his prior express consent. *Id.* at 14; *see* 47 U.S.C. § 227(b)(1)(A)(iii), (b)(1)(B). In Count 2, he accuses the company of initiating telephone solicitations to his residential cell phone even though he had registered that number on the DNC List. Dkt. No. 18 at 14–15; *see* 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). Blair asks the Court to award statutory damages, treble damages "[t]o the extent [Assurance IQ]'s misconduct is determined to be willful and knowing," and further requests injunctive relief prohibiting Assurance IQ's "unsolicited calling activity[.]" Dkt. No. 18 at 14–16; *see also id.* at 7 ("Blair brings forward this case seeking injunctive relief requiring [Assurance IQ] to cease from violating the TCPA[.]").

Blair v. Assurance IQ LLC, Not Reported in Fed. Supp. (2023)

Case 1:26-cv-00658-JKM     Document 8     Filed 05/29/26     Page 19 of 32

**\*2** In addition to his individual TCPA claims, Blair's complaint levels several class allegations. *See id.* at 11–14. He asserts that "[o]ther consumers have ... complained on robocall websites regarding the identical pre-recorded voice message that [he] received, from the same telephone number ..., around the exact ... same time [he] received it[.]" *Id.* at 9; *see also id.* at 4–6. Blair accordingly seeks to represent two nationwide classes. The first proposed class is the "Pre-Recorded No Consent Class." *Id.* at 11. It includes all persons in the United States who, within the preceding four years, received from Assurance IQ a prerecorded voice telemarketing call on their cellular or residential landline number soliciting car insurance quotes on behalf of CarInsurance.net. *Id.* The second proposed class is the "Do Not Call Registry Class." *Id.* at 12. It includes all persons in the United States who, within the preceding four years, received from Assurance IQ more than one telemarketing call during any 12-month period soliciting car insurance quotes on behalf of CarInsurance.net when that person's residential number had been listed on the DNC List for at least 30 days. *Id.*

Assurance IQ moved to dismiss Blair's amended complaint. Dkt. No. 20. It also wants the Court to stay discovery pending resolution of the motion to dismiss or, alternatively, bifurcate discovery into an "individual claims" phase followed by (if necessary) a "class claims" phase. Dkt. No. 19 at 2.

## II. DISCUSSION

The Court addresses the motion to dismiss before turning to the motion to stay or bifurcate discovery.

### A. Motion to Dismiss

Dismissal under Federal Rule of Civil Procedure 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). At this stage, the Court accepts as true all factual allegations in the complaint and construes them in the light most favorable to the nonmoving party. *Gonzalez v. Google LLC*, 2 F.4th 871, 885 (9th Cir. 2021), *rev'd on other grounds by Gonzalez v. Google LLC*, 143 S. Ct. 1191 (2023) (per curiam). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see* Fed. R. Civ. P. 8(a)(2) (a plaintiff must make a "short and plain statement of the claim showing that the pleader is entitled to relief"). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Assurance IQ moves the Court to dismiss Blair's amended complaint "in its entirety with prejudice" because he (1) fails to sufficiently allege that the calls he received involved prerecorded messages; (2) fails to sufficiently allege that Assurance IQ willfully or knowingly violated the TCPA or its accompanying regulations, which is required for treble damages; and (3) fails to demonstrate the real and immediate threat of future injury necessary to obtain injunctive relief. Dkt. No. 20 at 2. The Court addresses these arguments in turn.

1. Sufficiency of TCPA Allegations – Count 1

As relevant here, the TCPA forbids any person from making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using ... an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii). The statute similarly prohibits any person from initiating "any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party[.]" *Id.* § 227(b)(1)(B). "In plain English, the TCPA prohibit[s] almost all robocalls to cell phones." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2344 (2020).

If a telemarketer violates the TCPA, the recipient of the call may bring an action "to enjoin such violation"; "to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater"; or both. 47 U.S.C. § 227(b)(3); *see Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) ("Congress aimed to curb telemarketing calls to which consumers did not consent by prohibiting such conduct and creating a statutory scheme giving damages if that prohibition was violated."). To plead a TCPA claim under Section 227(b)(1)(A)(iii) and (b)(1)(B), Blair must allege the following three elements: (1) the defendant called his cellular or residential phone number (2) using an artificial or prerecorded voice (3) without his prior express consent. *Rogers v. Assurance IQ, LLC*, No. 2:21-CV-00823-TL, 2023 WL 2646468, at \*3 (W.D. Wash. Mar.

Case 1:26-cv-00658-JKM Document 8 Filed 05/29/26 Page 20 of 32

Blair v. Assurance IQ LLC, Not Reported in Fed. Supp. (2023)

27, 2023) (citing *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012)).

**\*3** Assurance IQ targets the second element, arguing that Blair's amended complaint "does not provide any basis for this Court to reasonably infer that the 'voice' [he] allegedly heard was prerecorded as opposed to live." Dkt. No. 20 at 6. Although the amended complaint contains allegations about the tone, cadence, and timing of the speaker, Assurance IQ argues that Blair fails to specify "*what about* the tone, cadence, and timing indicated that the call was pre-recorded." *Id.* (emphasis original); *see id.* ("Plaintiff has fallen short here by parroting conclusory language."). The Court disagrees.

When, as here, a fact is an element of the claim (i.e., whether the defendant made the call using an artificial or prerecorded voice), it is insufficient for the plaintiff to merely recite that fact verbatim without other supporting details. *Makaron v. GE Sec. Mfg., Inc.*, No. CV-14-1274-GW(AGRX), 2014 WL 12614468, at \*2 (C.D. Cal. July 31, 2014); *Forney v. Hair Club for Men Ltd., Inc.,* No. CV-16-9640-R, 2017 WL 4685549, at \*2 (C.D. Cal. June 26, 2017) (a plaintiff must do more than plead statutory language from the TCPA). District courts in the Ninth Circuit generally require plaintiffs to plead circumstances sufficient to support an inference that the calls were placed with an artificial or prerecorded voice. *Rogers*, 2023 WL 2646468, at \*3 (collecting cases). For example, a plaintiff should be able to allege facts about the "tenor, nature, or circumstances of the alleged calls" or "otherwise demonstrate that a live human was not speaking during the calls." *Id.* at \*4 (internal quotation marks omitted) (quoting *Manopla v. Sansone Jr.'s 66 Automall*, No. 17-16522 (FLW) (LHG), 2020 WL 1975834, at \*2 (D.N.J. Jan. 10, 2020)); *see also, e.g.*, *Greene v. Select Funding, LLC*, No. 2:20-CV-07333-RGK-KS, 2021 WL 4926495, at \*4 (C.D. Cal. Feb. 5, 2021) (finding that plaintiff adequately stated a TCPA claim where he alleged that he knew the caller was a prerecorded message "based on the speaker's content, tone, and inflection; the generic content of the voice message, and the speaker's cadence" (cleaned up)); *Forney*, 2017 WL 4685549, at \*2 ("Successful TCPA complaints allege that the message[s] they received were scripted or impersonal, from an obviously automated number, formatted in code, or similar[ ] factual details."); *Johansen v. Vivant, Inc.*, No. 12-C-7159, 2012 WL 6590551, at \*3 (N.D. Ill. Dec. 8, 2012) ("[A] TCPA plaintiff could describe the robotic sound of the voice on the other line, the lack of human response when he attempted to have a conversation with the 'person' calling him, [or] the generic content of the message he received[.]").

Blair sufficiently alleges that the calls received on December 26, 2022 (7:52 PM), December 27, 2022 (10:02 AM), December 28, 2022 (10:02 AM), and December 30, 2022 (10:02 AM) involved a prerecorded voice message in violation of Section 227(b)(1)(A)(iii) and (b)(1)(B). With respect to the December 26th call, Blair contends the call involved a prerecorded voice "because of the tone, cadence, and timing of the speaker, which sounded unnaturally perfect." Dkt. No. 18 at 9. The voice's "unnaturally perfect" sound is enough at this stage for the Court to infer that it was artificial or prerecorded. The Court similarly concludes that Blair has alleged facts sufficient to infer that the December 27th, 28th, and 30th calls involved artificial or prerecorded voices. Blair received all three calls at the same time (10:02 AM) and resulted in "identical" voicemails delivering a generic sales pitch. *See id.* at 9–11. To be sure, Blair could have expounded more on how these voicemails were identical (e.g., the tone and cadence of the voice). At the dismissal stage, however, the Court views the facts in the light most favorable to Blair. And assuming—as the Court must—the truth of the facts asserted, Blair has identified suspicious timing (three calls placed at the exact same time on three separate days) and generic content (identical, nonspecific sales pitches) sufficient for the Court to reasonably infer that the speaker on the calls at issue was an artificial or prerecorded voice. Assurance IQ's motion to dismiss is denied with respect to Count 1. [1]

1    Assurance IQ does not challenge the sufficiency of Count 2. *See generally* Dkt. No. 20.

### 2. "Willful" or "Knowing" TCPA Violations: Treble Damages

**\*4** The TCPA vests district courts with discretion to award treble damages for willful or knowing violations of the statute or its regulations. 47 U.S.C. § 227(b)(3), (c)(5); *see Barr*, 140 S. Ct. at 2345. Blair appears to seek treble damages under Count I and Count II of his amended complaint. Dkt. No. 18 at 14–15 (Count I seeks "a minimum of $500 in damages, and up to $1,500 in damage" per violation, whereas Count II expressly demands "treble damages"). Assurance IQ argues that Blair's amended complaint "makes no allegation that [its] alleged conduct was willful and knowing." Dkt. No. 20 at 7 (emphasis omitted). At this juncture, the Court agrees. Nowhere does Blair allege that Assurance IQ's statutory violations were willful or knowing. He instead claims that, "[t]o the extent [Assurance IQ]'s misconduct is determined to be willful and knowing, the Court should ... treble the

Case 1:26-cv-00658-JKM    Document 8    Filed 05/29/26    Page 21 of 32

Blair v. Assurance IQ LLC, Not Reported in Fed. Supp. (2023)

amount of statutory damages recoverable by the members of the Do Not Call Registry Class." Dkt. No. 18 at 15–16. This is insufficient. The Court therefore dismisses Blair's claim for treble damages.

3. Standing to Seek Injunctive Relief

The TCPA permits a plaintiff to bring "an action based on a violation of th[e statute] or the regulations prescribed under th[e statute] to enjoin such violation[.]" 47 U.S.C. § 227(b)(3)(A). Assurance IQ's argument under Federal Rule of Civil Procedure 12(b)(1) contends, however, that Blair lacks Article III standing to seek injunctive relief because he "does not allege any threat of future injury[.]" Dkt. No. 20 at 8–9; see also Dkt. No. 24 at 5 ("The allegations belie any plausible inference of [future injury] given that the last alleged call was over four months ago."). While Assurance IQ does not specify whether it intends to mount a facial or factual attack, the substance of its motion indicates that it believes Blair's allegations are insufficient to invoke the Court's jurisdiction with respect to injunctive relief, i.e., it brings a facial challenge. See Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004) ("In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."). Blair counters that he need not allege a threat of future injury to obtain injunctive relief under the TCPA: "For a statutory injunction, like under the TCPA, if the 'plaintiff sufficiently alleges a claim for a statutory violation, that is all that is required to request injunctive relief in a complaint.' " Dkt. No. 23 at 7 (quoting Gutierrez v. Fla. Advert. & Mktg. Corp., 387 F. Supp. 3d 1410, 1411 (S.D. Fla. 2019)). The Court disagrees.

Standing is a threshold issue central to the Court's subject matter jurisdiction. Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007) (en banc). And the Supreme Court has repeatedly made clear that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Town of Chester, N.Y. v. Laroe Ests., Inc., 581 U.S. 433, 439 (2017) (cleaned up). The fact that a statute—here, the TCPA—provides for injunctive relief does not automatically convey standing to seek such relief. Cf. Campbell v. Facebook, Inc., 951 F.3d 1106, 1119–20 (9th Cir. 2020) (assessing whether plaintiffs established standing for injunctive relief under the ECPA, 18 U.S.C. § 2520, even though the statute provides for preliminary and other equitable relief); Spokeo, Inc. v. Robins, 578 U.S. 330, 341 (2016) (standing requirements are not automatically met "whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that

right."). Rather, a plaintiff must still show that his injury is concrete and likely to be redressed by the relief he seeks. Walsh v. Nevada Dep't of Hum. Res., 471 F.3d 1033, 1036–37 (9th Cir. 2006).

In terms of injunctive relief, then, Blair "must allege either continuing, present adverse effects" due to his exposure to Assurance IQ's past illegal conduct "or a sufficient likelihood that [he] will again be wronged in a similar way." Villa v. Maricopa Cnty., 865 F.3d 1224, 1229 (9th Cir. 2017) (cleaned up); accord Rogers, 2023 WL 2646468, at *7. The threat of injury "must be actual and imminent" rather than merely hypothetical. Davidson v. Kimberly-Clark Corp., 889 F.3d 956, 967 (9th Cir. 2018) (cleaned up). And last, "[a]llegations that a defendant's conduct will subject unnamed class members to the alleged harm is insufficient to establish standing to seek injunctive relief on behalf of the class." Matera v. Google Inc., No. 15-CV-04062-LHK, 2016 WL 5339806, at *15 (N.D. Cal. Sept. 23, 2016) (citing Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1044–45 (9th Cir. 1999) (en banc)); see also Villa, 865 F.3d at 1229 (class representative could not seek injunctive relief on behalf of class because she lacked standing to pursue that relief).

**\*5** A district court resolves a facial jurisdictional attack as it would a Rule 12(b)(6) motion: accepting Blair's allegations as true and drawing all reasonable inferences in his favor, the Court determines whether the allegations are sufficient to invoke its jurisdiction. See Leite v. Crane Co., 749 F.3d 1117, 1121 (9th Cir. 2014). "When evaluating whether the standing elements are present, [the district court] must look at the facts as they exist at the time the complaint was filed." Slayman v. FedEx Ground Package Sys., Inc., 765 F.3d 1033, 1047 (9th Cir. 2014) (cleaned up). Blair filed his amended complaint on March 28, 2023. At that point, it had been three months since the last alleged call. See Dkt. No. 18 at 11 (last call occurred December 30, 2022). And Blair does not allege continuing, present adverse effects due to his exposure to Assurance IQ's calls. He instead frames his injury in the past tense: "The unauthorized solicitation telephone calls ... harmed Plaintiff Blair in the form of annoyance, nuisance, and invasion of privacy, occupied his phone line, and disturbed the use of and enjoyment of his phone." Id. at 11. Past exposure to unlawful conduct is insufficient to confer standing to seek injunctive relief unless the plaintiff continues to suffer adverse effects. Mayfield v. United States, 599 F.3d 964, 970 (9th Cir. 2010); see also Davidson, 889 F.3d at 967 (past harms may bear on whether a real and immediate threat of repeated injury exists, but they are insufficient by

Blair v. Assurance IQ LLC, Not Reported in Fed. Supp. (2023)

Case 1:26-cv-00658-JKM     Document 8     Filed 05/29/26     Page 22 of 32

themselves to grant standing); *Campbell*, 951 F.3d at 1120 (finding "combination of continuing harm plus likelihood of future harm" sufficient to confer standing to seek injunctive relief).

Nor does Blair allege a sufficient threat of future harm— let alone "actual and imminent" or "certainly impending" harm. Indeed, he does not even mention the possibility of future calls. And according to the amended complaint, he only received calls over a period of seven days. *See* Dkt. No. 18 at 7–11 (cataloguing calls); *Miller v. Time Warner Cable Inc.*, No. 8:16-CV-00329-CAS (ASX), 2016 WL 7471302, at *4 (C.D. Cal. Dec. 27, 2016) (risk that defendant would continue to make unsolicited calls to plaintiff's phone was "too speculative" to establish a real and immediate threat of injury because plaintiff had not received an unsolicited call in eight months at the time of filing her complaint). Because Blair does not allege ongoing harm from past conduct or establish a sufficient likelihood of future harm, he lacks standing to seek injunctive relief on his or the class's behalf. *See Villa*, 865 F.3d at 1229. The Court accordingly dismisses Blair's claim for injunctive relief.

### 4. Leave to Amend

The Court will permit Blair leave to file a second amended complaint curing the deficiencies identified above. Federal Rule of Civil Procedure 15(a)(2) directs district courts to "freely give leave when justice so requires." As the language of the rule suggests, the standard for leave to amend is "very liberal," *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006), because "the underlying purpose of Rule 15 [is] to facilitate [a] decision on the merits, rather than on the pleadings or technicalities," *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (cleaned up). A district court should therefore grant leave to amend even when, as here, no request to amend the pleading was made, "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (cleaned up). A court may deny leave to amend "only if there is strong evidence of undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of amendment[.]" *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (cleaned up). Beyond merely requesting dismissal with prejudice, Assurance IQ does not contend any of these factors are present.

### B. Motion to Stay or, Alternatively, Bifurcate Discovery

Assurance IQ next urges the Court to stay discovery pending resolution of its motion to dismiss. Dkt. No. 19 at 3–6. The Court denies this request as moot because it has now ruled on the motion.

Alternatively, Assurance IQ argues that the Court should modify its March 15, 2023 Scheduling Order Regarding Class Certification Motion and bifurcate discovery into two phases: an initial 90-day merits phase limited to Blair's individual claims, followed by a conditional class-based phase (should Blair succeed on his claims). *Id.* at 2, 6–10; *see* Dkt. No. 17 (Mar. 15, 2023 Scheduling Order). Assurance IQ wants the opportunity to move for summary judgment on Blair's individual claims at the close of the merits phase in hopes of avoiding "costly and burdensome [class] discovery that may be moot[.]" *Id.* at 8. The Court declines Assurance IQ's request to bifurcate discovery for the reasons set forth below.

**\*6** "A district court has broad powers of case management, including the power to limit discovery to relevant subject matter and to adjust discovery as appropriate to each phase of litigation." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803–04 (Fed. Cir. 1999); *see also Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988) ("The district court has wide discretion in controlling discovery."); *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009) (the district court has broad discretion to control the class certification process, including class-related discovery). As part of this power, the district court also has broad discretion to determine whether to bifurcate discovery prior to certification. *Hunichen v. Atonomi LLC*, No. C19-0615-RAJ-MAT, 2020 WL 5759782, at *1 (W.D. Wash. Sept. 28, 2020); *True Health Chiropractic Inc. v. McKesson Corp.*, No. 13-CV-02219-JST, 2015 WL 273188, at *1 (N.D. Cal. Jan. 20, 2015). The Court may consider the following factors in deciding whether bifurcation is appropriate: (1) the overlap between individual and class discovery; (2) whether bifurcation promotes Rule 23(c)(1)(A)'s requirement that certification be decided "[a]t an early practicable time"; (3) judicial economy; and (4) any prejudice reasonably likely to flow from the grant or denial of a stay of class discovery. *Hunichen*, 2020 WL 5759782, at *1.[2] The Court addresses these factors in turn.

2     Assurance IQ's request to bifurcate discovery also implicates Federal Rule of Civil Procedure 16(b)

Blair v. Assurance IQ LLC, Not Reported in Fed. Supp. (2023)

Case 1:26-cv-00658-JKM    Document 8    Filed 05/29/26    Page 23 of 32

(4). That is, it must demonstrate "good cause" to modify the Court's existing case schedule. For the purposes of this motion, the Court considers this inquiry subsumed by the four-factor bifurcation analysis. Assurance IQ frames its arguments under that test, and it does not otherwise attempt to articulate good cause for amending the case schedule.

1. Overlap Between Individual and Class Discovery

The first factor weighs against bifurcation. "Generally at the pre-class certification stage, discovery in a putative class action is limited to certification issues such as the number of class members, the existence of common questions, typicality of claims, and the representative's ability to represent the class." *Gusman v. Comcast Corp.*, 298 F.R.D. 592, 595 (S.D. Cal. 2014). The Supreme Court has, however, repeatedly emphasized that the class certification decision requires "a rigorous analysis" of Rule 23(a)'s prerequisites, and "[s]uch an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013) (cleaned up). This is because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 34 (cleaned up). Thus, the distinction between merits discovery and class discovery "is not always clear," and "[m]any courts are, for this reason, reluctant to bifurcate class and merits discovery." *Hunichen*, 2020 WL 5759782, at *1; *see also, e.g.*, *Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. ED-CV-15-2057-FMO-(SPX), 2018 WL 501413, at *3 (C.D. Cal. Jan. 5, 2018) ("[T]he distinction between class certification and merits discovery is murky at best and impossible to determine at worst.").

Here, too, there is overlap between the class determination inquiry and the merits of Blair's underlying claims. This overlap includes the existence of common questions of law or fact and predominance under Rule 23(a)(2) and (b)(3). *See Hunichen*, 2020 WL 5759782, at *2. "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) (cleaned up). And Blair's two proposed classes track his underlying causes of action verbatim. *Compare* Dkt. No. 18 at 11–12 (proposed classes), *with id.* at 14–15 (individual claims). Assurance IQ appears to concede the presence of at least some overlap in this case, but protests this factor is outweighed by the others.

*See* Dkt. No. 19 at 7. As none of the factors favor bifurcation, this argument is irrelevant.

2. Promotion of Rule 23(c)(1)(A)

**\*7** The second factor likewise counsels against bifurcation. Federal Rule of Civil Procedure 23(c)(1)(A) directs district courts to determine whether an action should be certified as a class action "[a]t an early practicable time[.]" The Advisory Committee Notes to the 2003 amendment recognize that in some cases the defendant "may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified." However, the Notes also caution against "forcing an artificial and ultimately wasteful division between 'certification discovery' and 'merits discovery.' "

Assurance IQ initially contends that "any extension owing to bifurcation would not jeopardize class certification motions in this case." Dkt. No. 19 at 8. But it immediately contradicts this representation by admitting that this is precisely what would happen: "Assurance only requests 90 days to complete discovery as to Plaintiff's individual claims.... At most, class certification would be extended only three months from this Court's current deadline[.]" *Id.* Assurance IQ suggests, however, that such a delay is acceptable. Relying on *True Health*, it argues that bifurcation does not offend Rule 23(c)(1)(A)'s directive so long as class certification occurs within two years of a case's filing. *Id.* at 7. And because Blair initiated this suit in January 2023, moving the certification motion deadline (currently set for January 2024) back three months still ensures that will occur within two years. *Id.* at 8.

To the extent Assurance IQ touts *True Health* as establishing a bright-line rule for acceptable delay, the Court disagrees. The district court in *True Health* confronted a delay between the filing of the plaintiff's complaint and the extended certification deadline that was longer than the prospective delay here. But the case does not stand for the proposition that bifurcation is always appropriate so long as certification occurs within two years of the action's commencement. And more importantly, the concerns the court noted in *True Health* are present in this case. There the court rejected the bifurcation request involving an initial 45-day "individual issues" phase (as opposed to a 90-day initial phase) because of the *additional* delay associated with a separate motion for summary judgment:

Blair v. Assurance IQ LLC, Not Reported in Fed. Supp. (2023)

Case 1:26-cv-00658-JKM    Document 8    Filed 05/29/26    Page 24 of 32

If the Court bifurcates discovery and grants Defendants forty-five days to conduct discovery solely as to individual issues, that discovery will likely not be complete until late March. Defendants would then have to prepare and file a motion for summary judgment; assuming this would require approximately a month, the motion would be filed in late April, and heard in early June. The Court would then have to issue an order on summary judgment, and only then—assuming [the proposed class representatives] remained in the case—could class discovery even *begin.* A motion for class certification would not be ready for hearing until class discovery was complete.

*True Health*, 2015 WL 273188, at *2 (emphasis original). This reasoning is equally applicable here. Bifurcation would delay rather than advance the class certification determination and would not promote Rule 23(c)(1)(A)'s requirement that certification occur "[a]t an early practicable time[.]"

### 3. Judicial Economy

Nor does the third factor favor bifurcation. The Court acknowledges that initially limiting discovery to Blair's individual claims could facilitate a more efficient resolution of this action and obviate the need for costly class-related discovery. Dkt. No. 19 at 8; *see, e.g.*, *Young v. Mophie, Inc.*, No. SACV-19-827 JVS (DFMX), 2020 WL 1000578, at *3 (C.D. Cal. Jan. 7, 2020); *Deleon v. Time Warner Cable LLC*, No. CV-09-2438-AG (RNBX), 2009 WL 10674767, at *2 (C.D. Cal. Nov. 2, 2009). It concludes, however, that the risks of bifurcation outweigh the potential benefits in this case. Just as the district court observed in *True Health*, bifurcation poses a substantial risk of complicating this litigation with a slew of disputes over whether certain discovery relates to class issues or Blair's individual claims. 2015 WL 273188, at *2; *see also, e.g.*, *Ahmed*, 2018 WL 501413, at *3 ("[B]ifurcation often creates unnecessary gaps in the evidence as a defendant has a strong incentive to withhold evidence[.]"); *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US,*

*LLC*, No. 8:10-CV-2008-T-33TGW, 2011 WL 486123, at *2 (M.D. Fla. Feb. 7, 2011) (questioning whether, given the "murky" distinction between merits and class issues, parties with an incentive to withhold damaging evidence can properly draw the line between the two categories during phased discovery); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 258 F.R.D. 167, 174 (D.D.C. 2009) ("Bifurcated discovery fails to promote judicial economy when it requires ongoing supervision of discovery. If bifurcated, this Court would likely have to resolve various needless disputes that would arise concerning the classification of each document as 'merits' or 'certification' discovery." (cleaned up)).

**\*8** Additionally, the Court must weigh the possibility that discovery will validate Blair's claims and, should those claims survive (or win) summary judgment, demonstrate that he is an adequate class representative. If that proves to be the case, the Court and the parties will needlessly duplicate at least two lengthy steps in this litigation: discovery and dispositive motions practice. *True Health*, 2015 WL 273188, at *3; *see also Hartley-Culp v. Credit Mgmt. Co.*, No. 3:CV-14-0282, 2014 WL 4630852, at *4 (M.D. Pa. Sept. 15, 2014) ("[B]ifurcation of discovery in this case will increase litigation expenses by protracting the discovery period and by duplicating the discovery process, including the depositions."). Dkt. No. 21 at 4 (detailing duplicated efforts).

### 4. Prejudice

The fourth and final factor is neutral. "The potential for prejudice resulting from granting or denying the motion to bifurcate runs both ways." *True Health*, 2015 WL 273188, at *3. On the one hand, bifurcation would delay production of class-related discovery and therefore temporarily deprive Blair of information necessary to support the proposed classes' claims. On the other, Assurance IQ could needlessly incur serious expenses in responding to Blair's class-related discovery requests should Blair's individual claims prove unsubstantiated or unsuccessful. *Id.*; Dkt. No. 19 at 9 (documenting several class-related interrogatories and requests for production); *but see Hunichen*, 2020 WL 5759782, at *2 (finding prejudice to defendants "minimized by the unavoidable overlap with merits discovery, the ongoing relevance of merits discovery beyond class certification, and the avoidance of disputes over what does and does not constitute solely class-based discovery.").

Three factors weigh against bifurcation while one is neutral. The Court accordingly finds bifurcation inappropriate in this case and denies this aspect of Assurance IQ's motion.

Blair v. Assurance IQ LLC, Not Reported in Fed. Supp. (2023)

Case 1:26-cv-00658-JKM    Document 8    Filed 05/29/26    Page 25 of 32

### III. CONCLUSION

The Court DENIES Assurance IQ's Motion to Stay Discovery or, in the Alternative, to Bifurcate Discovery, Dkt. No. 19, and GRANTS IN PART and DENIES IN PART its Motion to Dismiss Amended Complaint, Dkt. No. 20.

Should Blair wish to file an amended complaint curing the deficiencies identified above, he must do so within 14 days of the date of this Order.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6622415

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Miller v. Time Warner Cable Inc., Not Reported in Fed. Supp. (2016)

2016 WL 7471302

2016 WL 7471302
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Vanessa MILLER

v.

TIME WARNER CABLE INC.

Case No. 8:16-cv-00329-CAS (ASx)
|
Filed 12/27/2016

**Attorneys and Law Firms**

Theodore W. Maya, Robert Ahdoot, Tina Wolfson, Ahdoot and Wolfson PC, West Hollywood, CA, Ismael T. Salam, Lite DePalma Greenberg, LLC, Joseph J. Siprut, Richard L. Miller, II, Siprut PC, Chicago, IL, for Vanessa Miller.

Alexandra A. Roje, Latham and Watkins LLP, Los Angeles, CA, Andrew D. Prins, Matthew A. Brill, Peter L. Winik, Latham and Watkins LLP, Washington, DC, for Time Warner Cable Inc.

**Proceedings:** (IN CHAMBERS)—DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO DISMISS, OR IN THE ALTERNATIVE TO STAY, PLAINTIFFS' CLAIMS (Filed June 27, 2016, Dkt. 40)

CHRISTINA A. SNYDER, District Judge

## I. INTRODUCTION

 *1  On February 24, 2016, Vanessa Miller filed this putative class action against Time Warner Cable, Inc ("TWC") alleging one claim for violation of the Telephone Consumer Protection Act, 47 U.S.C. §§ 227, *et seq* ("TCPA"). Dkt. 1. The gravamen of plaintiff's claim is that she is a former TWC customer who received repeated, unsolicited sales calls from TWC after she terminated her subscription for cable or internet services from TWC.

On June 27, 2016, TWC filed a motion to compel arbitration and dismiss plaintiff's claim or stay proceedings pending arbitration pursuant to the arbitration clause of plaintiff's Residential Services Subscriber Agreement. Dkt. 40. On July 5, 2016, plaintiff filed an opposition. Dkt. 44. On July 5, 2016, defendant filed a reply. Dkt. 46.

Also on July 5, 2016, plaintiff filed a motion to stay this case pending a decision by the Judicial Panel on Multidistrict Litigation ("JPML") regarding a motion to consolidate and transfer eleven separate actions, including this one. Dkt. 47. The Court continued the hearing on defendant's motion to compel arbitration and subsequently granted plaintiff's motion to stay proceedings pending a decision by the JPML. See Dkt. 49, 55. On October 14, 2016, the parties filed a joint status report noting that the motion to consolidate and transfer this action had been denied by the JPML. Dkt. 56. Accordingly, the Court administratively reopened proceedings and scheduled a hearing regarding defendant's motion to compel arbitration for December 5, 2016. Dkt. 57.

On November 30, 2016, defendant filed a notice of supplemental authority in support of its motion to compel arbitration addressing the subsequent history of a district court case upon which plaintiff's opposition, in part, relied. Dkt. 60.

On December 5, 2016, the Court held oral argument on the instant motion and thereafter took the matter under submission. Dkt. 61. Having carefully considered the parties' arguments, the Court finds and concludes the following.

## II. BACKGROUND
TWC is a provider of cable and internet services. Plaintiff subscribed to TWC's services from April 2, 2014, until June 2, 2015. In May 2015, plaintiff moved residences and contacted TWC to cancel her subscription to TWC services. Compl. ¶ 14.

Plaintiff alleges that after canceling her TWC subscription, starting in June 2015, she began receiving calls from TWC on her wireless telephone. Id. ¶ 17. According to plaintiff, the phone calls were unsolicited, id. ¶ 28, and being performed by an autodialer (also known as a robocaller) on TWC's behalf, id. ¶ 27. TWC allegedly called plaintiff's telephone in the morning, afternoon, and night in an attempt to market its services. Id. ¶ 18. Plaintiff claims to have received between one to three calls per day for one month. Id. ¶ 19. Plaintiff alleges that "[o]n information and belief, TWC has made and continues to make phone calls to Plaintiff's and the Class members' wireless phones without prior express consent." Id. ¶ 25. Defendant acknowledges having hired a third-party to call plaintiff after she terminated her subscription. Defendant offers evidence that any such calls were part of its customer retention program and ended in June 2015, after plaintiff requested that TWC no longer contact her. Green Decl. ¶¶ 5-8.

2016 WL 7471302

**\*2** Defendant presents evidence that plaintiff agreed to a Residential Services Subscriber Agreement ("the Subscriber Agreement") when she first subscribed to TWC's services. Plaintiff does not contest that she agreed to the Subscriber Agreement.

The first page of the Subscriber Agreement provides that:

> THIS AGREEMENT CONTAINS A BINDING "ARBITRATION CLAUSE," WHICH SAYS THAT YOU AND TWC AGREE TO RESOLVE CERTAIN DISPUTES THROUGH ARBITRATION, AND ALSO CONTAINS A LIMITATION ON YOUR RIGHT TO BRING CLAIMS AGAINST TWC MORE THAN ONE YEAR AFTER THE RELEVANT EVENTS OCCURRED. YOU HAVE THE RIGHT TO OPT OUT OF THESE PORTIONS OF THE AGREEMENT. SEE SECTIONS 14, 15 AND 16.

Opp'n Ex. A ("Agreement") at 1. Thereafter, the Subscriber Agreement sets forth the parties' respective responsibilities pursuant to plaintiff's subscription. Section 15, entitled "Unless you Opt Out, You are Agreeing to Resolve Certain Disputes Through Arbitration," provides in pertinent part:

> (a) Arbitration or Small Claims Court. Our goal is to resolve Disputes fairly and quickly. However, if we cannot resolve a Dispute with you, then, except as described elsewhere in Section 15, each of us agrees to submit the Dispute to the American Arbitration Association for resolution under its Commercial Arbitration Rules or, by separate mutual agreement, to another arbitration institution. As an alternative, you may bring your claim in your local "small claims" court, if its rules permit it....

> (b) Types of Claims.... Only claims for money damages may be submitted to arbitration; claims for injunctive orders or similar relief must be brought in a court (other than claims relating to whether arbitration is appropriate, which will be decided by an arbitrator, not a court) ...

(g) Jury Waiver. Any Dispute properly brought in a court of law in connection with our Customer Agreements (including this Agreement) will be heard and decided by a judge, not a jury. Each of us waives (in other words, gives up) the right to a jury trial in any such Dispute.

Id. at 11-12. The Subscriber Agreement defines "Dispute" to mean:

> any dispute, claim, or controversy between you and TWC regarding any aspect of your relationship with us or any conduct or failure to act on our part, including claims based on breach of contract, tort (for example, a negligence or product liability claim), violation of law or any claims based on any other theory, and including those based on events that occurred prior to the date of this Agreement.

Id. at 13. Finally, with respect to termination of services, the Subscriber Agreement further provides that, "The terms of this Agreement relating to ... resolution of disputes (Section 15) ... will survive (in other words, continue to apply to you even after) the termination of this Agreement." Id. at 15.

### III. DISCUSSION

Plaintiff seeks both damages and injunctive relief. Defendant argues that plaintiff lacks standing to pursue injunctive relief and that, therefore, plaintiff's claim for injunctive relief must be dismissed. Additionally, defendant seeks to compel arbitration of plaintiff's claim for damages. The Court addresses each in turn.

#### A. Standing to Bring a Claim for Injunctive Relief

The arbitration clause of the Subscriber Agreement is limited to claims for damages and notes that claims for injunctive relief should be brought before a court. However, defendant argues that plaintiff lacks standing to bring a claim for injunctive relief pursuant to the TCPA because plaintiff appears to concede that TWC ceased making unsolicited calls to her telephone approximately eight months before initiation of this action.

2016 WL 7471302

**\*3** "Standing is a threshold matter central to our subject matter jurisdiction." Bates v. United Parcel Service, Inc., 511 F.3d 974, 985 (9th Cir. 2007). To have standing to bring a claim for relief, the plaintiff must show that his injury "is likely to be redressed by the relief she seeks." Walsh v. Nevada Dep't of Human Res., 471 F.3d 1033, 1036–37 (9th Cir. 2006). "Past exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects." Mayfield v. United States, 599 F.3d 964, 970 (9th Cir. 2010) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). A plaintiff is only entitled to injunctive relief if she can demonstrate a "real or immediate threat" that she will be subject to the alleged illegal conduct again. City of Los Angeles v. Lyons, 461 U.S. 95, 96 (1983).

Plaintiff argues that she has standing to pursue her claim for injunctive relief because TWC's voluntary cessation of telephone calls does not make her claim for injunctive relief moot. In support of her argument, plaintiff relies upon the line of cases which have held that:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.... In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189 (2000) (internal quotation marks and citations omitted).

Defendant does not contend that there is *no relief* available to plaintiff such that her claim is moot. Defendant contends that plaintiff lacks standing to seek a particular form of relief. Mootness and standing are similar doctrines; however, the standards governing mootness are inapplicable here. As the Supreme Court explained in Friends of the Earth, Inc.,

confusion regarding the two doctrines is "understandable, given this Court's repeated statements that the doctrine of mootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).' " 528 U.S. at 189 (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n. 22 (1997)). However, for present purposes, there is an important difference.

> [A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur. By contrast, in a lawsuit brought to force compliance, it is the plaintiff's burden to establish standing by demonstrating that, if unchecked by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, and that the threatened injury is certainly impending.

Id. at 190 (citations, brackets, and internal quotation marks omitted). "[T]here are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." Id. Among other things, the standing doctrine helps ensure scarce resources are devoted to disputes in which the parties have "a concrete stake." Id. at 191. "In contrast, by the time mootness is an issue, the case has been brought and litigated, often (as here) for years. To abandon the case at an advanced stage may prove more wasteful than frugal." Id. at 191-92.

**\*4** In this case, the Court concludes that the risk TWC will continue to make unsolicited phone calls to plaintiff's phone is too speculative to establish a real or immediate threat of repeated injury. Defendant presents undisputed evidence that it has not called plaintiff's telephone since June 2015, when plaintiff requested that she no longer be contacted by TWC. See Green Decl. ¶¶ 6-8. At the time plaintiff initiated this action, plaintiff had not received an unsolicited call from TWC in approximately eight months. Nor does plaintiff present evidence that she has received a phone call from TWC

Miller v. Time Warner Cable Inc., Not Reported in Fed. Supp. (2016)

2016 WL 7471302

since June 2015. In light of that fact, nothing indicates that plaintiff has more than a hypothetical stake in equitable relief. Once one party has brought a "factual motion by presenting affidavits or other evidence" suggesting the court is without jurisdiction to hear a claim, "the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty., 343 F.3d 1036, 1040 n. 2 (9th Cir. 2003) (citing St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir. 1989)). Plaintiff presents no evidence rebutting defendant's evidence that it has respected plaintiff's request not to be called and ceased calling plaintiff approximately eight months before this action was brought.[1] Accordingly, plaintiff is without standing to seek injunctive relief and said claim for relief is properly dismissed.

[1] Plaintiff also contends that the risk that putative class members will continue to face unsolicited phone calls confers standing for injunctive relief. In support of her argument, plaintiff relies upon Meyer v. Portfolio Recovery Associates, LLC, 707 F.3d 1036 (9th Cir. 2012), wherein the court affirmed the provisional certification of a class as well as a preliminary injunction against a defendant who attempted to argue there was no risk of irreparable harm because it "assured the court it would stop calling [the named plaintiff] without making any assurance regarding other members of the provisional class." Id. at 1045. However, in this case, the Court has not provisionally certified any class. Nor did Meyer purport to evaluate the named plaintiff's standing to bring a claim for injunctive relief. Contrary to plaintiff's argument, the Supreme Court has held that a party's "abstract concern with a subject ... does not substitute for the concrete injury required by Article III." Simon v. E. Kentucky Welfare Rights Org., 426 U.S. 26, 40 (1976). "That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' " Id. at 40 n. 20 (quoting Warth v. Seldin, 422 U.S. 490, 502 (1975)). Even if plaintiff's class had already been certified, plaintiff would have to demonstrate her own standing to bring a claim for injunctive relief. See Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007) (noting that standing is satisfied if "at least one named plaintiff meets the requirements" and evaluating "whether at least one named plaintiff satisfies the standing requirements for injunctive relief"); Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc., 256 F.3d 879, 884 (9th Cir. 2001) ("Even construing the complaint as alleging that unnamed members of the class ... were injured ... [plaintiffs] have not shown injury in fact, because they must allege injury to a named plaintiff" to establish standing).

**B. Arbitration of Plaintiff's Claim for Damages**

The Federal Arbitration Act ("FAA") provides that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects a "liberal federal policy favoring arbitration agreements." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 25 (1991) (quoting Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)). The "first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate the dispute." Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc., 473 U.S. 614, 626 (1985). Normally, the court must determine (1) whether there exists a valid agreement to arbitrate; and (2) if there is a valid agreement, whether the dispute falls within its terms. Chiron Corp. v. Ortho Diagnostic Sys., 207 F.3d 1126, 1130 (9th Cir. 2000). "However, these gateway issues can be expressly delegated to the arbitrator where 'the parties *clearly and unmistakably* [delegate arbitrability to an arbitrator].' " Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015) (emphasis in Opus Bank) (quoting AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986)). The parties' only disagreement here is whether the Subscriber Agreement clearly and unmistakably delegates the issue of arbitrability to an arbitrator. Plaintiff does not contend that the arbitration clause of the Subscriber Agreement is unconscionable or that the delegation of arbitrability to an arbitrator would be unconscionable.

**\*5** The Ninth Circuit has concluded that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." Opus Bank, 796 F.3d at 1130. Plaintiff does not dispute that the

Subscriber Agreement incorporates the American Arbitration Association's ("AAA's") rules, see Agreement § 15(a), but argues that Opus Bank's holding is limited to agreements between sophisticated parties.

In Opus Bank, the Ninth Circuit observed that "the vast majority of the circuits that hold that incorporation of the AAA rules constitutes clear and unmistakable evidence of the parties' intent do so without explicitly limiting that holding to sophisticated parties." Opus Bank, 796 F.3d at 1130-31. The court further observed that its holding "should not be interpreted to require that contracting parties be sophisticated ... before a court may conclude that incorporation of the AAA rules," adequately demonstrates the parties' intent. Id. at 1130. However, the court nevertheless limited its holding "to the facts of the present case, which do involve an arbitration agreement 'between sophisticated parties.' " Id. at 1131 (quoting Oracle America, Inc. v. Myriad Group A.G., 724 F.3d 1069, 1057 & n. 2 (9th Cir. 2013)). As defendant points out, the greater weight of authority has concluded that the holding of Opus Bank applies similarly to non-sophisticated parties. See Zenelaj v. Handybook Inc., 82 F. Supp. 3d 968, 974 (N.D. Cal. 2015) (cases concluding that less-sophisticated parties do not clearly and unmistakably delegate arbitrability by incorporation of AAA rules are "at odds with the prevailing trend of case law"); but see Tompkins v. 23andMe, Inc., 2014 WL 2903752, at *11 (N.D. Cal. June 25, 2014) (Koh, J.), aff'd, No. 14-16405, 2016 WL 6072192 (9th Cir. Oct. 13, 2016) ("There is good reason not to extend this doctrine from commercial contracts between sophisticated parties to online click-through agreements crafted for consumers").

The Court joins most other courts addressing this issue and concludes that the incorporation of AAA's rules clearly and unmistakably shows the parties' intent to delegate the issue of arbitrability to the arbitrator. However, the Courts ruling here need not rest on that basis alone. The Subscriber Agreement explicitly provides that "claims relating to whether arbitration is appropriate ... will be decided by an arbitrator, not a court." Agreement § 15(b).

Plaintiff seeks to avoid this conclusion by arguing that other provisions of the Subscriber Agreement conflict with its apparent delegation of arbitrability to the arbitrator. Specifically, plaintiff points to two provisions of the Subscriber Agreement which plaintiff contends create ambiguity. Plaintiff relies upon a clause which provides "[i]f a court or similar body determines that a portion of a

Customer Agreement is invalid or unenforceable the rest of the agreement should stand," Agreement § 20(b), and a clause providing "[a]ny Dispute properly brought in a court of law in connection with our Customer Agreements ... will be heard and decided by a judge, not a jury," Id. § 15(g). Plaintiff argues that the foregoing allusions to courts create ambiguity as to whether arbitrability has been delegated to an arbitrator or the courts.

Neither provision upon which plaintiff relies is in conflict with the Subscriber Agreement's clear and unmistakable delegation of authority to the arbitrator. Because claims for injunctive relief must, pursuant to the Subscriber Agreement, be brought before a court rather than an arbitrator, the Subscriber Agreement contemplates some disputes being properly decided by a court rather than an arbitrator. Accordingly, the mere reference to a court making decisions based upon the Subscriber Agreement is insufficient to undermine its explicit provision that "whether arbitration is appropriate" shall be decided by an arbitrator rather than a court. Section 20(b) of the agreement is a severability clause, separate and apart from the arbitration clause, which provides that the Subscriber Agreement shall survive partial invalidation by a court "or similar body." Section 15(g) is a purported waiver of the right to a jury trial, should any claim be "properly brought before a court." Even if arbitrability is delegated to the arbitrator, that does not foreclose some claims being "properly brought before a court," such as claims for injunctive relief or claims that an arbitrator has found to be outside the scope of the arbitration agreement.

**\*6** In light of the foregoing, the Court concludes that plaintiff's claim for damages must be sent to arbitration. The Court further concludes that the arbitrator shall determine whether arbitration is appropriate. Defendant's motion to compel arbitration on plaintiff's claim for damages is therefore **GRANTED**.

Nothing in this order precludes plaintiff from arguing before the arbitrator that her claim is not subject to the arbitration clause of the Subscriber Agreement. Accordingly, dismissal of plaintiff's claim for damages is inappropriate as it may deprive plaintiff of a forum for relief. Accordingly, any further proceedings in this action are hereby stayed pursuant to 9 U.S.C. § 3.[2]

2      Defendant argues that, if the Court stays proceedings, the Court should dismiss the class claims pursuant to the class action waiver contained

**Miller v. Time Warner Cable Inc., Not Reported in Fed. Supp. (2016)**
2016 WL 7471302

in the Subscriber Agreement. The parties have not had the opportunity to brief the enforceability and applicability of the class action waiver provisions contained in the Subscriber Agreement. Additionally, it is not yet clear whether the arbitrator will determine that plaintiff's claims are subject to arbitration pursuant to the Subscriber's Agreement. Accordingly, the Court finds said issue inappropriate for decision at this time and finds it more appropriate to stay further proceedings in this action. See Mohamed v. Uber Techs., Inc., 836 F.3d 1102, 1108 (9th Cir. 2016) (characterizing class action availability as a delegable question of arbitrability unless the agreement assigns only some arbitrability questions to the arbitrator and others to the court); Emilio v. Sprint Spectrum L.P., 508 Fed.Appx. 3, 6 (2d Cir. 2013) (where the parties delegated arbitrability to the arbitrator, "the district court was not free to decide [the enforceability of a class action waiver] for itself");

Meadows v. Dickey's Barbecue Restaurants Inc., 144 F. Supp. 3d 1069, 1087 n.8 (N.D. Cal. 2015) (staying class claims pending the arbitrator's decision on arbitrability).

## IV. CONCLUSION

Defendant's motion to dismiss plaintiff's claims for injunctive relief is **GRANTED**. Defendant's motion to compel arbitration is **GRANTED**. Further proceedings in this action are hereby stayed. It is **ORDERED** that this action is hereby removed from this Court's active caseload until further application by the parties or order of this Court. Any scheduling conferences presently scheduled in this matter are hereby **VACATED**.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7471302

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 29, 2026, a copy of the foregoing was served on all counsel of record in this matter via the Court's ECF system.

*/s/ Christopher A. Reese*
Christopher A. Reese

8603192v.1